GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELVIN COLEMAN, MEGAN PARKS, and SUSAN COLBY, as individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CKE RESTAURANTS INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

THE PARTIES..................................................................................................................2

JURISDICTION AND VENUE .........................................................................................3

FRAUDULENT CONCEALMEANT AND TOLLING..........................................................3

SUBSTANTIVE ALLEGATIONS .....................................................................................4

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........................................4

    B.    Defendant Falsely Informed Users That They Could Reject All Cookies Used on the Website. ...............................................................................11

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. ...................................................18

        1.    Google Cookies.......................................................................18

        2.    TikTok Cookies. .....................................................................23

        3.    Snapchat Cookies....................................................................28

    D.    The Third Parties Intercept User Communications While in Transit. ...............29

    E.    The Signaling and Addressing Information Intercepted by the Third Parties.................................................................................................31

    F.    The Private Communications Collected are Valuable. ....................................33

PLAINTIFFS' EXPERIENCES .......................................................................................34

CLASS ALLEGATIONS .................................................................................................42

CAUSES OF ACTION....................................................................................................44

    First Cause of Action: Invasion of Privacy.........................................................44

    Second Cause of Action: Intrusion Upon Seclusion...........................................46

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........................................48

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ................................51

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation.............53

    Sixth Cause of Action: Unjust Enrichment.................................................................56

PRAYER FOR RELIEF ..................................................................................................58

CLASS ACTION COMPLAINT

Plaintiffs Melvin Coleman, Megan Parks, and Susan Colby (each individually a "Plaintiff" and, collectively, the "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against CKE Restaurants, Inc. ("Defendant" or "Carl's Jr."). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

### INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and a breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.carlsjr.com, or the "Website"), Defendant displays to them a popup cookie consent banner that discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject All" cookies, as shown in the following screenshot:



2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to "Reject All" cookies, Defendant nonetheless caused third parties—including Google LLC (www.youtube.com, googleads.g.doubleclick.net, play.google.com), TikTok USDS Joint Venture LLC (TikTok) and Snap Inc. (SnapChat) (collectively, the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.      Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding the Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles with unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what the Website's visitors sought to avoid when they clicked or selected the "Reject All" button on the Website's cookie consent banner. Defendant falsely told its Website's users that it respected their privacy choices and it would refrain from tracking and data sharing when users rejected "All" cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiff and those similarly situated users of the Website.

## THE PARTIES

7.      Plaintiff Melvin Coleman is, and was at all relevant times, an individual and resident of San Leandro, California. Plaintiff intends to remain in California and makes his permanent home there.

8.      Plaintiff Megan Parks is, and was at all relevant times, an individual and resident of Corona, California. Plaintiff intends to remain in California and makes her permanent home there.

- 2 -
CLASS ACTION COMPLAINT

9. Plaintiff Susan Colby is, and was at all relevant times, an individual and resident of Clovis, California. Plaintiff intends to remain in California and makes her permanent home there.

10. Defendant CKE Restaurants, Inc. is a Delaware corporation with its headquarters and principal place of business in Tennessee.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13. Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

15. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**FRAUDULENT CONCEALMEANT AND TOLLING**

16. The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite rejecting "All" cookies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experiences on the Website would have

- 3 -
CLASS ACTION COMPLAINT

alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting his data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

17.    On or about June 6, 2023, Defendant was notified by Plaintiffs' counsel that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and transmitted to third parties despite users' rejection of all such cookies and the selling of user information. Despite this notice, Defendant did not disclose this conduct to users.

18.    Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could "Reject All" cookies, while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the June 6, 2023 demand letter describing substantially similar claims. These circumstances, including Defendant's concealment and misleading representations, warrant tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

**A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

19.    Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on either of the Website, the user's browser sends a "GET" request to a particular Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website's servers receive an HTTP request, they process that request and send back an HTTP response. The HTTP request

- 4 -

includes the client's IP address, which allows the Website's servers to identify the origin of the request and return the response.

20. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

21. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

22. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website's programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the websites' code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and the Third Parties.

23. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

24. First-party cookies are those that are placed on the user's device directly by the web servers with which the user is knowingly communicating (in this case, the Website's servers). First-party cookies are used to track users when they repeatedly visit the same website.

CLASS ACTION COMPLAINT

25. A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; doubleclick.net; play.google.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

26. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to the Third Parties, enabling them to surreptitiously track in real time and collect the Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a user of the Website visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with the Website's content;

- **Interests and Preferences**: Insights into user interests based on the types of content viewed, products searched for, or topics engaged with on the Website;

- 6 -
CLASS ACTION COMPLAINT

- **Shopping Behavior**: Information about the products viewed or added to shopping carts on the Website;
- **Device Information**: Details about the user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current browsing session on the Website, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

27. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

28. Defendant is a fast-food restaurant company that owns, operates, franchises, markets, and manages popular restaurant brands, including Carl's Jr. Defendant also owns and operates the Website, which allows visitors to, among other things, obtain information about

- 7 -
CLASS ACTION COMPLAINT

Defendant's restaurants, menu offerings, promotions, locations, loyalty and rewards programs, and online ordering services for pickup and delivery. As users interact with the Website—including by entering information into forms, searching for menu items or restaurant locations, selecting products, customizing orders, clicking links, and navigating webpages—they communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

29.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls its Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

30.     Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

**3. Cookies and Other Tracking Technologies**

When you use our Online Services, we may collect certain information via automated means, including common online tracking tools such as cookies, pixels, APIs, and web beacons. For example, we may collect information about visitors' preferences, to record user-specific information on which pages a visitor accesses or visits, and customize web page content based on visitors' browser types or other information that a visitor sends via their browser or other means. We also use website tracking technologies to support our advertising and marketing—for example, to show you relevant ads for our products or to track when you make a purchase with us after seeing an ad elsewhere on the internet. Some of our tracking technologies collect information using location-based data services for uses such as identifying restaurants near a user or timing for an order.

…

In addition, to provide you with a more relevant and interesting experience, we may participate in behavioral-based advertising. This means that Carl's Jr. and/or one of our vendors may place a cookie on your browser, or use a web beacon, to

- 8 -

CLASS ACTION COMPLAINT

collect information about your use of our Online Services so that Carl's Jr. and/or a third party can provide advertising about products and services tailored to your interest (including, without limitation, products and services offered by Carl's Jr. and its affiliates). These ad servers or ad networks use technology to the advertisements and links that appear on the Online Services sent directly to your browser. They automatically receive your IP address when this occurs…

…

**4. Google Analytics**

Carl's Jr. has implemented certain Google Analytics advertising features for our Website, including Remarketing with Google Analytics, Google Display Network Impression Reporting, Google Analytics Demographics and Interest Reporting and Integrated services that require Google Analytics to collect data via advertising cookies and device identifiers. As a part of these programs, Google, as a third-party vendor, makes use of certain cookies and device identifiers to serve ads on the Website and to provide certain behavioral, demographic and interest data. Google's use of these cookies enables it to serve ads to users based on their visit to the Website and other sites on the internet.[1]

31.     Defendant further explained the categories of third-party cookies it used on the Website as follows in its Privacy Preference Center, which was accessible by clicking the "Cookie Settings" button in the cookie popup consent window:



_____

[1] Carl's Jr. Privacy Policy (available at https://www.carlsjr.com/privacy-policy ) (the "Privacy Policy").

CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT

**B.    Defendant Falsely Informed Users That They Could Reject All Cookies Used on the Website.**

32.    When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." The banner then purported to provide users the opportunity to either "Accept All Cookies[,]" "Reject All" cookies, or otherwise manage "Cookie Settings[,]" as shown in the following screenshot from the Website:

33.    Plaintiffs and other Website users who clicked or selected the "Reject All" cookies button, thereby indicating their choice and/or agreement to decline or reject all cookies

- 11 -

CLASS ACTION COMPLAINT

and tracking technologies in use on the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

34. Defendant's popup cookie consent banner led Plaintiff, and all those users of the Website similarly situated, to believe that they declined or rejected all cookies and tracking technologies, especially those used to "analyze site usage, and assist in [Defendant's] marketing efforts[.]" The banner further reasonably led Plaintiffs and those users of the Website similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Reject All" cookies button.

35. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other Website users' wishes. When Plaintiffs and other of the Website's users clicked or selected the "Reject All" cookies button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

36. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or transmitted to the Third Parties which enabled the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

37. Some aspects of the operations of the Third Parties' cookies on the Website can be observed using specialized tools that log incoming and outgoing network transmissions to

- 12 -

CLASS ACTION COMPLAINT

and from the Website. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a user's device and browser to the Third Parties, even after the user clicked or selected the "Reject All" cookies button on the Website's popup cookie consent banner, at different times during the class period:



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



38.      The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.carlsjr.com. The screenshots depict only network traffic occurring *after* the user chose to "Reject All" cookies using the buttons available on the Website's cookie banner. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website

- 16 -

CLASS ACTION COMPLAINT

resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.youtube.com, googleads.g.doubleclick.net, play.google.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to the Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "Reject All" cookies button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of "All" cookies.

39.    Plaintiffs' and other users' Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies.

40.    As users interact with the Website, even after clicking or selecting the "Reject All" cookies button, thereby declining or rejecting the use of cookies and similar technologies for analyzing site usage and assisting in Defendant's marketing efforts, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because the Third Parties' cookies track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). The Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep

- 17 -

CLASS ACTION COMPLAINT

understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

41.    The Third Parties' code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entitles from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties have the capability to use the contents of conversations it collects through its wiretaps for their own purposes as described in more detail below.

**C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[2]**

**1.    Google Cookies.**

42.    Defendant causes third-party cookies to be transmitted to and from its Website's users' browsers and devices, even after users choose to "Reject All" cookies, to and from the **www.youtube.com**, **googleads.g.doubleclick.net**, and **play.google.com** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[4] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies

---

[2] This section contains multiple examples of specific data being sent from a user's browser to the Third Parties. Each example was collected after the user had clicked or selected the "Reject All" button on Defendant's Website.
[3] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[4] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

CLASS ACTION COMPLAINT

enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[5]

43.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[6] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

44.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[7] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[8]

45.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data,

---

[5] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[6] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[7] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
[8] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

CLASS ACTION COMPLAINT

(v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[9]

46.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data—including cookie data—to be sent to Google's advertising domain, doubleclick.net, even after the user has rejected cookies:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

[9] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=11962135750754589O8-NC&visit_id=63867O675669576522-2267O83756&ref_topic=73O2618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

47. Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[10]

48. The "user-agent" header corresponds to the device, operating system, and browser that the user has used to access the Website.

49. Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

50. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

51. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[11]

---

[10] https://policies.google.com/technologies/cookies?hl=en-US.
[11] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

- 22 -

CLASS ACTION COMPLAINT

52.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[12] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**2.    TikTok Cookies.**

53.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by TikTok USDS Joint Venture LLC, known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[13]

54.    TikTok utilizes cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[14] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used

---

[12] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[13] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[14] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

55.    These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[15]

56.    For example, the TikTok software code that Defendant causes to be stored on and executed by the Website user's device causes data—including cookie data—to be sent to TikTok's domain, even after users reject cookies. An example of that data is as follows:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[15] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

POST  200 OK  https://analytics.tiktok.com/api/v2/pixel/act

Request  Header  Query  Body  Cookies  Raw | Summary  +                    PLAIN ⌄  ⊜

{
  "_inspection": {},
  "action": "Click",
  "auto_collected_properties": {
    "page_trigger": "Click",
    "trigger_element": {
      "attributes": {
        "id": "onetrust-reject-all-handler"
      },
      "inner_text": "REJECT ALL",
      "num_child_buttons": 0,
      "position": {
        "x": 38.546875,
        "y": 514
      },
      "tag": "BUTTON",
      "timestamp": "2023-10-25T18:30:36.507Z",
      "xpath": "/HTML/body[1]/div[2]/div[2]/div[1]/div[1]/div[1]/div[2]/div[1]/button[2]"
    }
  },
  "context": {
    "ad": {
      "jsb_status": 2,
      "sdk_env": "external"
    },
    "device": {
      "platform": "pc"
    },
    "index": 5,
    "library": {
      "name": "pixel.js",
      "version": "2.1.33"
    },

- 25 -

```
34 ∨    "page": {
35        "referrer": "",
36        "url": "https://www.carlsjr.com/"
37      },
38      "pageview_id": "pageId-1698258595078-7949169527479",
39 ∨    "pixel": {
40        "code": "CGNM1MJC77UBUP73PF7G",
41        "codes": "CGNM1MJC77UBUP73PF7G",
42        "runtime": "1"
43      },
44      "session_id":
         "c502f9d0-7361-11ee-8276-b8cef6cb6388::8gQ1TgAQSkukPujlRBv8",
45 ∨    "user": {
46        "anonymous_id": "dttiGqr3m6JmuM9xp5QABuTs8G_"
47      },
48      "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
         AppleWebKit/537.36 (KHTML, like Gecko) Chrome/118.0.0.0 Safari/537.36",
49      "variation_id": "test_3"
50    },
51    "event_id": "",
52    "is_onsite": false,
53    "message_id": "messageId-1698258636508-9525555624760",
54    "properties": {},
55 ∨  "signal_diagnostic_labels": {
56 ∨    "hashed_email": {
57        "label": "missing"
58      },
59 ∨    "hashed_phone": {
60        "label": "missing"
61      },
62 ∨    "raw_auto_email": {
63        "label": "missing"
64      },
65 ∨    "raw_auto_phone": {
66        "label": "missing"
67      },

68 ∨    "raw_email": {
69        "label": "missing"
70      },
71 ∨    "raw_phone": {
72        "label": "missing"
73      }
74    },
75    "timestamp": "2023-10-25T18:30:36.508Z"
76  }
```

POST    200 OK    https://analytics.tiktok.com/api/v2/pixel/act

Request  Header  Query  Body  Cookies  Raw │ Summary  +

| Key | Value |
| --- | --- |
| _ttp | 2XGbvlu56WnDuCDoRJw0lZYq9lo |

CLASS ACTION COMPLAINT

57.    The data above includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[16] Further, as shown above, the data includes the exact time—down to the millisecond—that the user viewed the page in question. The data also includes the user's platform—a pc, or Windows computer.

58.    As further shown above, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[17]

59.    Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/118.0.0.0 Safari/537.36 |
| --- | --- |

60.    As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

61.    Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

62.    By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[18]

---

[16] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).
[17] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[18] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

63.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[19]

### 3.    Snapchat Cookies.

64.    As shown above, the Website further causes data—including cookie data—to be sent to **tr.snapchat.com**, even after users have rejected cookies. That domain is associated with Snap Inc., the social media company that owns Snapchat. Snapchat is multimedia messaging app that lets users share photos, videos, text, and drawings—often designed to disappear after being viewed. Snapchat uses cookies to collect identifying data and data on users' browsing history, choices, and interactions with advertisements.[20] This data helps Snap personalize ad content and track users across the internet.[21] As Snap explains, it uses the data collected by Snapchat cookies "for optimization, custom audience creation, look-alike modeling, reporting, machine learning, and targeting capabilities. All uses are … meant to deliver better results for our ad products."[22].

65.    In particular, the Website caused the user's browser to send the "sc_at" cookie to Snap:

---

[19] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).
[20] *See, e.g.*, https://businesshelp.snapchat.com/s/article/snap-privacy-faq; https://businesshelp.snapchat.com/s/article/snap-pixel-about; https://businesshelp.snapchat.com/s/article/conversions-api; and https://marketingapi.snapchat.com/docs/conversion.html?shell#conversion-parameters.
[21] *Id.*
[22] Snap Business Help Center, Pixel Implementation FAQs (available at https://businesshelp.snapchat.com/s/article/snap-pixel-faq).

- 28 -
CLASS ACTION COMPLAINT

Snap documentation confirms that the sc_at cookie persists on the user's device for a full year, and that it is "[u]sed to identify a visitor across multiple domains."[23]

**D.    The Third Parties Intercept User Communications While in Transit.**

66.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

67.    First, the Third Parties must read the data in real time in order to *transform* it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

68.    Second, the Third Parties read the data in real time in order to *deduplicate* events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[24] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device

---

[23] https://www.snap.com/privacy/cookie-information.

[24] For example, Google's server-to-server API is the **Google Ads Conversion API**. TikTok uses the **TikTok Events API**. Snapchat's is the **Snapchat Conversions API**.

CLASS ACTION COMPLAINT

identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

69.    Third, the Third Parties read and analyze incoming communications in real time to *validate* and *filter* the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

70.    Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

71.    To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

72.    On information and belief, the Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[25] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is

---

[25] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.

CLASS ACTION COMPLAINT

stored.[26] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, *transform the data*, and write the data to a destination."[27] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[28] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[29]

73.   Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E.    The Signaling and Addressing Information Intercepted by the Third Parties.**

74.   The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

---

[26] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

[27] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

[28] *Id.*

[29] *Id.*

CLASS ACTION COMPLAINT

75.     The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

76.     Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

77.     Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the

characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.    The Private Communications Collected are Valuable.**

78.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

79.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular fast food menu items and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

80.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader fast food restaurant market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

81.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[30] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit

---

[30] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

- 33 -

CLASS ACTION COMPLAINT

from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

82. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

83. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Melvin Coleman

84. Plaintiff Coleman visited the Website to seek and obtain information about Defendant's fast food menu offerings, promotions, specials, and online ordering options, while located in California, on one or more occasions during the last four years, including approximately twice per month. In particular, Plaintiff Coleman regularly visited the Website to review promotional deals, promo codes, and new menu items, and to place online orders for pickup from Defendant's restaurant locations.

85. Plaintiff Coleman's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Coleman is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

86. When Plaintiff Coleman visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" cookies button. Plaintiff Coleman viewed Defendant's representation on the popup cookie consent banner that, "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze

site usage, and assist in our marketing efforts." Plaintiff Coleman also viewed Defendant's additional representation that, rather than choosing to "Accept All Cookies[,]" users could instead "Reject All" cookies.

87.    Plaintiff Coleman selected and clicked the "Reject All" cookies button. Plaintiff Coleman believed that selecting the "Reject All" cookies button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services, including the Third Parties, for the purposes of analyzing site usage and assisting in Defendant's marketing efforts).

88.    In selecting the "Reject All" cookies button, Plaintiff Coleman gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Coleman specifically rejected, based on Defendant's representations, those cookies used to "analyze site usage, and assist in [Defendant's] marketing efforts" and share information with the Third Parties. In reliance on these representations and promises, only then did Plaintiff Coleman continue browsing the Website.

89.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for analyzing site usage and assisting in Defendant's marketing efforts, to be placed on Plaintiff Coleman's device and/or transmitted to the Third Parties, along with user data, without Plaintiff Coleman's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Coleman that he could reject the use and/or placement of "All" cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Coleman believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

90.    Then, as Plaintiff Coleman continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Coleman's clear rejection of the use and/or placement of all such cookies and tracking technologies, Defendant

- 35 -

nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in analyzing site usage and assisting in Defendant's marketing efforts, from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Coleman's Private Communications as Plaintiff Coleman browsed the Website.

91.    Defendant's representations that consumers could "Reject All" cookies while Plaintiff Coleman and users browsed the Website, or at least those involved in analyzing site usage and assisting in Defendant's marketing efforts, were untrue. Had Plaintiff Coleman known this fact, he would not have used the Website. Moreover, Plaintiff Coleman reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Coleman would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

92.    Plaintiff Coleman continues to desire to browse content featured on the Website. Plaintiff Coleman would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Coleman would likely browse the Website again in the future, but will not do so until then. Plaintiff Coleman regularly visits websites that feature content similar to that of the Website. Because Plaintiff Coleman does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Coleman will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff

CLASS ACTION COMPLAINT

Coleman is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Megan Parks**

93.     Plaintiff Parks visited the Website to seek and obtain information about Defendant's fast food menu options, while located in California, on one or more occasions during the last four years.

94.     Plaintiff Parks's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Parks is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

95.     When Plaintiff Parks visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" cookies button. Plaintiff Parks viewed Defendant's representation on the popup cookie consent banner that, "By clicking 'Accept All Cookies', you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Plaintiff Parks also viewed Defendant's additional representation that, rather than choosing to "Accept All Cookies[,]" users could instead "Reject All" cookies.

96.     Plaintiff Parks selected and clicked the "Reject All" cookies button. Plaintiff Parks believed that selecting the "Reject All" cookies button on the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services, including the Third Parties, for the purposes of analyzing site usage and assisting in Defendant's marketing efforts).

97.     In selecting the "Reject All" cookies button, Plaintiff Parks gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Parks specifically rejected, based on Defendant's representations, those cookies used to "analyze site usage, and assist in [Defendant's] marketing

efforts" and share information with third parties, including the Third Parties. In reliance on these representations and promises, only then did Plaintiff Parks continue browsing the Website.

98.     Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for analyzing site usage and assisting in Defendant's marketing efforts, to be placed on Plaintiff Parks's device and/or transmitted to the Third Parties, along with user data, without Plaintiff Parks's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Parks that she could reject the use and/or placement of "All" cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Parks believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

99.     Then, as Plaintiff Parks continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Parks's clear rejection of the use and/or placement of all such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in analyzing site usage and assisting in Defendant's marketing efforts, from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Parks's Private Communications as Plaintiff Parks browsed the Website.

100.     Defendant's representations that consumers could "Reject All" cookies while Plaintiff Parks and users browsed the Website, or at least those involved in analyzing site usage and assisting in Defendant's marketing efforts, were untrue. Had Plaintiff Parks known this fact, she would not have used the Website. Moreover, Plaintiff Parks reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Parks would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

CLASS ACTION COMPLAINT

101.    Plaintiff Parks continues to desire to browse content featured on the Website. Plaintiff Parks would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Parks would likely browse the Website again in the future, but will not do so until then. Plaintiff Parks regularly visits websites that feature content similar to that of the Website. Because Plaintiff Parks does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Parks will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Parks is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Susan Colby**

102.    Plaintiff Colby visited the Website to seek and obtain information about Defendant's fast food menu options, while located in California, on one or more occasions during the last four years.

103.    Plaintiff Colby's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Colby is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

104.    When Plaintiff Colby visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Reject All" cookies button. Plaintiff Colby viewed Defendant's representation on the popup cookie consent banner that, "By clicking 'Accept All Cookies', you

- 39 -
CLASS ACTION COMPLAINT

agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Plaintiff Colby also viewed Defendant's additional representation that, rather than choosing to "Accept All Cookies[,]" users could instead "Reject All" cookies.

105. Plaintiff Colby selected and clicked the "Reject All" cookies button. Plaintiff Colby believed that selecting the "Reject All" cookies button on the popup cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks and analytics services, including the Third Parties, for the purposes of analyzing site usage and assisting in Defendant's marketing efforts).

106. In selecting the "Reject All" cookies button, Plaintiff Colby gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Colby specifically rejected, based on Defendant's representations, those cookies used to "analyze site usage, and assist in [Defendant's] marketing efforts" and share information with the Third Parties. In reliance on these representations and promises, only then did Plaintiff Colby continue browsing the Website.

107. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for analyzing site usage and assisting in Defendant's marketing efforts, to be placed on Plaintiff Colby's device and/or transmitted to the Third Parties, along with user data, without Plaintiff Colby's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Colby that she could reject the use and/or placement of "All" cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Colby believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

108. Then, as Plaintiff Colby continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite her clear rejection of the use

- 40 -

CLASS ACTION COMPLAINT

and/or placement of all such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in analyzing site usage and assisting in Defendant's marketing efforts, from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Colby's Private Communications as she browsed the Website.

109.    Defendant's representations that consumers could "Reject All" cookies while Plaintiff Colby and users browsed the Website, or at least those involved in analyzing site usage and assisting in Defendant's marketing efforts, were untrue. Had Plaintiff Colby known this fact, she would not have used the Website. Moreover, Plaintiff Colby reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all cookies, Plaintiff Colby would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

110.    Plaintiff Colby continues to desire to browse content featured on the Website. Plaintiff Colby would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Colby would likely browse the Website again in the future, but will not do so until then. Plaintiff Colby regularly visits websites that feature content similar to that of the Website. Because Plaintiff Colby does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all cookies and tracking technologies, Plaintiff Colby will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff

- 41 -

Colby is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

111. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website in the State of California after clicking or selecting the "Reject All" button in the Website's popup cookies consent banner.

112. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

113. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

114. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

115. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

      a.     Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

116.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected all cookies, and had their confidential Private Communications intercepted by the Third Parties.

117.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

118.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an

- 43 -

important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

119. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

120. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

121. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

122. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Reject All" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected cookies and reasonably expected that their rejection of all cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected all cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information,

- 44 -

CLASS ACTION COMPLAINT

interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

123. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

124. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

125. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

126. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

CLASS ACTION COMPLAINT

127. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

128. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

129. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

130. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

131. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

132. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

133. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in

violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of the Website's users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

134. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to the Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "Reject All" cookies.

135. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "Reject All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

136. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Reject All" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

137. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

CLASS ACTION COMPLAINT

138. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

139. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

140. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

141. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

142. California Penal Code § 631(a) provides, in pertinent part:

"Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

143. Defendant is a "person" within the meaning of California Penal Code § 631.

144. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

CLASS ACTION COMPLAINT

145. The Third Parties are separate legal entities that offer a software-as-a-service and not merely a passive device. Further, the Third Parties have the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were a third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other.

146. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

147. At all relevant times, the Website caused Plaintiffs' and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

148. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

149. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information,

- 49 -

CLASS ACTION COMPLAINT

interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

150. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

151. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow the Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject all cookies in the consent banner.

152. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to the Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

153. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy, (ii) loss of value in his and their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

CLASS ACTION COMPLAINT

154.    Pursuant to California Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

155.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to fast food restaurants and menu options. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if his and their request to reject all cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

156.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

157.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

- 51 -

CLASS ACTION COMPLAINT

158. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

159. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

160. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

161. At all relevant times, Defendant caused pen registers (e.g., the Third Parties' software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be transmitted to the Third Parties.

162. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website.

163. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking or selecting the "Reject All" cookies button in the cookie consent banner.

CLASS ACTION COMPLAINT

164. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

165. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

166. Pursuant to Penal Code § 637.2(a)(1), Plaintiff and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

167. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

168. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "Reject All" cookies.

169. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Reject All" cookies button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Reject All" cookies.

170. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

171. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

172. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third

CLASS ACTION COMPLAINT

Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject all cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

173. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Websites. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

174. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

175. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See, e.g.*, California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

- 54 -
CLASS ACTION COMPLAINT

176. On information and belief, Defendant either knew its representations regarding users' ability to reject all cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

177. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

178. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

179. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of his and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

180. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information and communications.

181. Defendant's representation that consumers could reject "All" cookies (including cookies used for analyzing site usage and assisting in Defendant's marketing efforts) if they

- 55 -

clicked or selected the "Reject All" cookies button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website's visitors' devices that are related to analyzing site usage and assisting in marketing efforts and/or share information with third parties, even after they choose to reject all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

182. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

183. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

184. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

185. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

186. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

187. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

- 56 -

CLASS ACTION COMPLAINT

188. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Reject All" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

189. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

190. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

191. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at his and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

192. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

193. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

194. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

195. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

CLASS ACTION COMPLAINT

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A.      Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.      An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.      An award of punitive damages;

D.      An award of nominal damages;

E.      An order for full restitution;

F.      An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.      An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.      For reasonable attorneys' fees and the costs of suit incurred; and

I.      For such further relief as may be just and proper.

Dated: May 15, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT